IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

WEST VIRGINIA HIGHLANDS CONSERVANCY,
APPALACHIAN VOICES, and
SIERRA CLUB,

            Plaintiffs,

v.                                              CIVIL ACTION NO.   3:19-0573

LEXINGTON COAL COMPANY, LLC,

            Defendant.

MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiffs' Motion for Injunctive Relief. ECF No. 49. For the

following reasons, this Motion is **GRANTED.**

BACKGROUND

This Court previously granted partial summary judgment to Plaintiffs, finding Defendant

liable for: 1) violations of its selenium limits in its Clean Water Act (CWA) National Pollutant

Discharge Elimination System (NPDES) permits at the Low Gap No. 2 and No. 10 Mines; 2) for

violations of its CWA 401 certification for discharging pollutants at the No. 10 Mine which caused

violations of West Virginia water quality standards, and; 3) for Surface Mining Control and

Reclamation Act (SMCRA) violations at the No. 2 and No. 10 Mines for discharging excessive

levels of selenium and ionic pollutants. *Mem. Op. and Order*, ECF No. 29; *Order*, ECF No. 30.

Following the Court's decision, the parties attempted to settle the action; however, these

settlement discussions have broken down. *Pls.' Mot. for Inj. Relief*, ECF No. 49, at 2. Plaintiffs

filed this Motion on September 17, 2021, after it became clear to the parties that the settlement

discussions were not moving forward. Plaintiffs request that the Court order Defendant to submit

a plan to come into compliance with both the CWA and SMCRA within 30 days. ECF No. 49 at 2. Plaintiffs also request that the Court order Defendant to achieve compliance with selenium limits no later than one year from the date of plan submission and to comply with West Virginia ionic pollution standards as soon as possible. *Id.*

## LEGAL STANDARD

Plaintiffs here seek a permanent injunction. In successful citizen suits, the Court may enjoin violations of the CWA. *See* 33 U.S.C. § 1365(a); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 53 (1987) ("If the citizen prevails in such an action, the court may order injunctive relief and/or impose civil penalties payable to the United States Treasury."). To be entitled to this injunctive relief, Plaintiffs must "satisfy a four-factor test," demonstrating:

(1) That it has suffered an irreparable injury;
(2) That remedies available at law, such as monetary damages, are inadequate to compensate for that injury;
(3) That, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and
(4) That the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The Court will turn to each factor of this analysis to determine whether Plaintiffs have adequately demonstrated that they are entitled to the requested injunctive relief.

a. <u>Plaintiffs can demonstrate irreparable injury that cannot be addressed by monetary damages</u>

1. Selenium

This Court has already found Defendant liable for violating the conditions of its permit limiting the discharges of selenium. ECF No. 29, at 7, 10. The Court has also recognized the toxic nature of selenium and the irreparable damage it causes to West Virginia's aquatic

environment. *Ohio Valley Envtl. Coal., Inc. v. Hobet Mining, LLC*, 723 F. Supp. 2d 886, 924 (S.D.W. Va. 2010). Selenium, when found in higher concentrations in aquatic environments, can impact the reproductive cycles of some aquatic species, can impair the development of fish, and can damage the organs of some aquatic organisms, such as gills. *Id.* at 900. Further, selenium in high concentrations can cause organ damage to humans. *Id.*

The West Virginia DEP recognized both Ben Creek and Pigeon Creek to be impaired for selenium. ECF No. 29 at 6. This means that these bodies of water are currently violating the state water quality standards for selenium. Defendant's NPDES permits Nos. WV1020579 and WV1016288 for the No. 2 and No. 10 Mines place an 8 mg/kg limit on fish-tissue selenium levels. *See* ECF Nos 21-20. 21-21, 21-22, 21-23. Since this Court's decision on liability, the Defendant's Discharge Monitoring Reports (DMRs) show that it has exceeded the fish-tissue based limits for selenium at outlets 012, 031, 045, and 047. *See Ohio Valley Envtl. Coal., Inc. v Fola Coal Co., LLC*, No. 2:12-3750, 2013 WL 6709957, at *24 ("DMRs constitute binding admissions." (citing *Hobet Mining*, 723 F. Supp. 2d at 923 (citations omitted))). Specifically, the June 2021 biannual test of selenium levels in fish-tissue found that outlet 012 reported a level of 9.9 mg/kg, outlet 031 reported a level of 10.2 mg/kg, outlet 045 reported a level of 10.13 mg/kg, and outlet 047 reported a level of 10.13 mg/kg. *Pls. Mot. for Inj. Relief, Ex. 1, DMR reports*, ECF No. 49-1.

Defendant argues that it is in compliance with its NPDES permit with respect to selenium because it conducts the bi-annual testing for selenium levels in fish-tissues. Defendant further relies on the opinion of Mr. Nick Baker to assert that compliance with the fish-tissue limit is measured by evaluating three consecutive instances of compliance/noncompliance results. Mr. Baker is a non-disclosed expert, and thus, the Court must reject his declaration. But further, Mr.

Baker's reading of the permit is simply not supported by the permit language. *See* ECF No. 21-20, at 3–4, 14–15, 21 ("The revised selenium effluent limitations for outlets 005, 012 & 031 will be based on the selenium fish whole-body dry weight value of 8.0 mg/kg for permit compliance purposes."); ECF No. 21-21, at 4–5, 14–15, 21 ("The revised selenium effluent limitations for outlets 045 and 047 will be based on the selenium fish whole-body dry weight value of 8.0 mg/kg for permit compliance purposes."); ECF No. 21-22, at 3–4, 8–9, 13 ("The revised selenium effluent limitations for outlets 002 and 019 will be based on the selenium fish whole-body dry weight value of 8.0 mg/kg for permit compliance purposes."); ECF No. 21-23, at 4–5, 14–16 ("The revised selenium effluent limitations for outlets 002, 017, 019, and 024 will be based on the selenium fish whole-body dry weight value of 8.0 mg/kg for permit compliance purposes."). His opinion purports to change the terms of Defendant's permit and its duty. There is no three-test determination for compliance in the permit language. Each permit modification indicates a selenium dry weight discharge limit of 8 mg/kg to be taken once a season by way of fish-tissue monitoring. There is no evidence in the record to support Defendant's interpretation of its compliance duties—but the Court has already ruled on its liability.

The permit modifications clearly demonstrate that the limit placed on selenium discharge is an enforceable permit limit for the purpose of compliance. *See* ECF Nos. 21-20, 21-21, 21-22, 21-23; *see Ohio Valley Envtl. Coal. v. Fola Coal Co., LLC*, 845 F.3d 133, 138 (4th Cir. 2017) ("A court must interpret an NPDES permit as it would a contract."). Plaintiffs have demonstrated that Defendant has continued to violate this fish-tissue limit for selenium since the liability finding. Because of the dangers excess selenium levels pose to the environment, and the fact that "environmental injury, by nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.* irreparable," the Court finds that Plaintiffs have

demonstrated irreparable injury. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Courts have routinely found that such injuries cannot be adequately addressed by money damages. *Hobet Mining*, 723 F. Supp. 2d at 924.

    2.  Ionic pollutants

This Court has already found that Defendant's discharges of ionic pollution from its No. 2 Mine and No. 2 Mines have caused or materially contributed to violations of West Virginia's narrative water quality standards, violating Defendant's CWA section 401 certification and SMCRA. As already explained in the opinion on liability, Plaintiffs' expert reports indicate that the streams below Defendant's mines continue to be biologically impaired and that such degradation is causally related to Defendant's discharges of ionic pollutants. *See* ECF No. 29, at 8–10. Defendant's DMRs show that, since that decision on liability, the ionic pollution discharged from its outfalls has not been reduced. Specifically, the DMRs show the following average conductivity and sulfate reports:

1. Location 002[1]
   a. April 2021
      i. Average conductivity—2017
      ii. Average sulfate—924
   b. May 2021
      i. Average conductivity—2390
      ii. Average sulfate—1050
   c. June 2021
      i. Average conductivity—2540
      ii. Average sulfate—1225
2. Location 024
   a. April 2021
      i. Average conductivity—1850
      ii. Average sulfate—731.5
   b. May 2021
      i. Average conductivity—1821
      ii. Average sulfate—868
   c. June 2021
      i. Average conductivity—1949

---

[1] Locations 002 and 024 are under Permit WV1016288.

            ii.  Average sulfate—980
3.  Location 005[2]
    a.  April 2021
            i.  Average conductivity—2022
            ii.  Average sulfate—1072.5
    b.  May 2021
            i.  Average conductivity—2320
            ii.  Average sulfate—1235
    c.  June 2021
            i.  Average conductivity—2680
            ii.  Average sulfate—1420
4.  Location 012
    a.  April 2021
            i.  Average conductivity—1076.5
            ii.  Average sulfate—462.5
    b.  May 2021
            i.  Average conductivity—1247
            ii.  Average sulfate—523.5
    c.  June 2021
            i.  Average conductivity—1486
            ii.  Average sulfate—670.5
5.  Location 031
    a.  April 2021
            i.  Average conductivity—2001.5
            ii.  Average sulfate—952
    b.  May 2021
            i.  Average conductivity—2066
            ii.  Average sulfate—986.5
    c.  June 2021
            i.  Average conductivity—2415
            ii.  Average sulfate—1110
6.  Location 045
    a.  April 2021
            i.  Average conductivity—1956.5
            ii.  Average sulfate—961.5
    b.  May 2021
            i.  Average conductivity—2415
            ii.  Average sulfate—1235
    c.  June 2021
            i.  Average conductivity—2385
            ii.  Average sulfate—1220
7.  Location 047
    a.  April 2021
            i.  Average conductivity—2007
            ii.  Average sulfate—947

---

[2] Locations 005, 012, 031, 045, and 047 are under permit WV1020579.

      b.  May 2021
            i.  Average conductivity—2170
           ii.  Average sulfate—1105
      c.  June 2021
            i.  Average conductivity—2064
           ii.  Average sulfate—1050.5

ECF No. 49-1. Defendant's DMRs since the liability finding show that it is still discharging high levels of ionic pollutants—levels that are on par with the levels of discharge that this Court found was causally related to the biological impairment the water bodies. *See Expert Report by Matthew E. Baker*, ECF No. 21-7, at 29, 32–3, 39–41, 48–49, 54–55, 60–61 (providing DMR report readouts for conductivity and sulfates for outfalls Nos. 002, 024, 005, 012, 031, 045, and 047, which were considered by Dr. Baker in his Expert Report on the Principal Cause of Biological Impairment at Lexington Coal Co.'s Low Gap and No. 10 Mines).

Defendant argues that it is shielded from liability. Defendant asserts that its NPDES permit has "report only" conditions for conductivity and sulfates, and therefore, because it is reporting these conditions, it is complying with its NPDES permit and thus is complying with the CWA. *See* 33 U.S.C. § 1342(k). However, this Court based its finding of liability with respect to ionic pollutants *not* on violations of Defendant's CWA section 402 NPDES permit, but on Defendant's CWA section 401 certification for the No. 10 Mine and its SMCRA permit. Compliance with a section 402 permit does not shield Defendant from liability with respect to either its section 401 certification or its SMCRA permit, as section 401 is found in 33 U.S.C. § 1341 and is not covered under the liability shield. *See* 33 U.S.C. § 1342(k) ("Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with section 1311, 1312, 1316, 1317, and 1343 of this title.").

This Court has already considered liability in this matter and found Defendant to have violated its CWA section 401 certification and its SMCRA permit. *See* ECF No. 29, at 8–10. The

lack of numeric limitations in the § 402 NPDES permit is immaterial because liability was not based on violations of the effluent limits in this permit. Defendant's argument regarding the lack of numeric limitations essentially purports to rewrite the permit or the standards by which to assess compliance. Further, to the extent that Defendant tries to deny liability, Defendant has waived this right because it failed to make any arguments at the Motion for Summary Judgment stage. Thus, the liability shield found in CWA section 402 does not apply.

Once a Court has determined that a violation has occurred, it has discretion to "order relief that will achieve compliance with the Act." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 318 (1982); *Ohio Valley Envtl. Coal. v. Fola Coal Co., LLC*, Nos. 2:13-21588, 2:13-16044, 2016 WL 3190255, at *10 (S.D.W. Va. June 7, 2016). This Court has already found that discharging high levels of ionic pollution that results in violations of water quality standards constitute irreparable harm that cannot be adequately remedied by money damages. *Fola Coal Co., LLC*, 2016 WL 3190255, at *10; *Amoco Prod. Co.*, 480 U.S. at 545 ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.* irreparable."); *Hobet Mining*, 723 F. Supp. 2d at 924.

Thus, the Court finds that Plaintiffs have established irreparable injury that cannot be addressed by money damages.

b. The balance of hardships tips in favor of Plaintiffs

When a Court considers the balance of hardships in an injunction determination, the Court must focus on the "underlying substantive policy the [statutory] process was designed to effect." *Amoco*, 480 U.S. at 544. One of the key objectives of the CWA is to achieve water quality standards. *Arkansas v. Oklahoma*, 503 U.S. 91, 106 (1992). With respect to environmental injuries, the balance of equities will "usually favor issuance of an injunction to

-8-

protect the environment." *Amoco Prod. Co.*, 480 U.S. at 545. Further, "harm to the environment outweighs a defendant's financial interests, particularly where the violations are of a longstanding and continual nature." *Fola Coal Co., LLC*, 2016 WL 3190255, at *10 (citing *Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1161 (D. Idaho 2012)). An injunction here would help protect West Virginia's aquatic resources and work toward the "overriding purpose of West Virginia's water quality standards and the goal of the state's permit requirements." *Ohio Valley Envtl. Coal. v. Elk Run Coal Co.*, 24 F. Supp. 3d 532, 579 (S.D.W. Va. 2014). In the face of the continued water quality standard violations, the balance of the equities favors the protection of the environment.

c.  The public interest would be furthered by a permanent injunction

"Protecting water quality is 'a critical public interest that profoundly outweighs a company's bottom line.'" *Fola Coal Co., LLC*, 2016 WL 3190255, at *11 (citing *Atlanta Gold Corp.*, 879 F. Supp. 2d at 1162). The public interest is further served by citizen suits that result in "injunctions requiring compliance with the CWA." *Id.* The public's interest in the protection and preservation of West Virginia's aquatic resources will be furthered by the issuance of a permanent injunction here.

Therefore, the Court finds that Plaintiffs have met their burden with respect to all four factors, making a permanent injunction an appropriate remedy.

d.  The relief requested by Plaintiffs is both feasible and appropriate

Plaintiffs make the argument that the specific injunctive relief appropriate to this matter is to require Defendant to submit a plan to come into compliance with the CWA and SMCRA, to achieve compliance with its selenium limits no later than one year from the date of plan

submission, and to achieve compliance with West Virginia standards related to ionic pollution as soon as possible.

This Court has found that the treatment of mine water to remove selenium is feasible. *Ohio Valley Envtl. Coal., Inc. v. Apogee Coal Co., LLC*, 744 F. Supp. 2d 561, 571 (S.D.W. Va. 2010) (noting several types of treatment systems are available to treat for selenium); *see also United States v. Arch Coal, Inc.,* No. 2:11-0133, 2011 WL 2493072 (S.D.W. Va. June 22, 2011) (discussing biological treatments for selenium). Requiring Defendants to initiate a plan to reduce ionic pollution is similarly feasible. *See Fola Coal Co*., *LLC*, 2016 WL 3190255 (discussing the Court's order that required Fola to submit a proposed plan to collect data so the Court could make a decision on remedies); *Ohio Valley Envtl. Coal., Inc. v. Apogee Coal Co., LLC,* 555 F. Supp. 2d 640, 649–50 (S.D.W. Va. 2008) (finding that plaintiffs' request for Apogee to develop a treatment plan was not unreasonable). The relief requested here, that Defendant develop a plan to come into compliance with the CWA and SMCRA, comply with its permit limits for selenium, and achieve water quality standards, is reasonable and appropriate.

The injunctive relief stage of this litigation was delayed giving the parties the chance to negotiate and settle the matter. Defendant must have realized that they would eventually be required to undertake some kind of treatment effort and has had the time since the liability finding to begin to contemplate planning this effort. Additionally, Plaintiffs were explicit in their request regarding the substance of the relief and the timing in which Defendant would have to comply with this relief. Defendant did not make any substantive response to these requests. Thus, the requested injunctive relief is reasonable.

**CONCLUSION**

The protection and preservation of West Virginia's aquatic resources is of utmost importance. Defendant's continued violations of the selenium permit limits and water quality standards serves to further the degradation of these resources. Thus, for the foregoing reasons, Plaintiffs have demonstrated they are entitled to a permanent injunction to address Defendant's ongoing violations. The Court **GRANTS** their Motion for Injunctive Relief. ECF No. 49.

The Court further finds the requested injunctive relief to be reasonable. Therefore, the Court **DIRECTS** Defendants to:

1) submit a plan to come into compliance with the CWA and SMCRA within thirty days;

2) achieve compliance with selenium limits no later than one year from the date of the plan submission, and;

3) achieve compliance with West Virginia standards related to ionic pollution as soon as possible.

The plans for each pollutant must include specific and enforceable interim milestones no longer than one year apart.

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        December 13, 2021

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE